**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| IN RE APPLICATIONS FOR ARREST | : | 3:23-MJ- 779 RMS |
| WARRANT AND SEARCH | : | |
| WARRANTS | : | **FILED UNDER SEAL** |
| | : | |
| | : | |

**MASTER AFFIDAVIT**

## Table of Contents

I.      INTRODUCTION ................................................................................. 3

II.     SUMMARY OF THE INVESTIGATION ............................................. 8

III.    TRAINING AND EXPERIENCE ....................................................... 10

IV.    BASIS AND SCOPE OF INFORMATION ........................................ 18

V.     UNDERCOVER AGENT ACTIVITES/CONTROLLED PURCHASES ............. 19

CONTROLLED PURCHASE #1 ................................................................ 20

CONTROLLED PURCHASE #2 ................................................................ 20

CONTROLLED PURCHASE #3 ................................................................ 22

CONTROLLED PURCHASE #4 ................................................................ 24

VI.    ADDITIONAL INFORMATION REGARDING THE SUBJECT PREMISES ... 26

Additional Information Pertaining to Subject Premises 1 ...................... 27

Events of July 13, 2023 .......................................................................... 28

Events of August 8, 2023 ....................................................................... 30

Additional Information Pertaining to Subject Premises 2 ...................... 31

Additional Information Pertaining to Subject Premises 3 ...................... 36

Events of August 2, 2023 ....................................................................... 38

Events of August 17, 2023 ..................................................................... 38

Additional Information Pertaining to Subject Vehicle ........................... 41

VI.    CONCLUSION ................................................................................. 43

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT                    ss: New Haven, Connecticut


COUNTY OF NEW HAVEN

### <u>MASTER AFFIDAVIT</u>

I, Alex MacNamara, being duly sworn, do depose and say:

## I.    INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I am currently assigned to the New Haven District Office ("NHDO") and have been since August 7, 2022. In my capacity as a Special Agent with the DEA, I am a participating member of the Organized Crime Drug Enforcement Task Force ("Task Force"), which comprises personnel from federal, state, and local law enforcement agencies.

3.      Prior to my assignment to the NHDO, I successfully completed a 17-week DEA training academy in Quantico, VA. Over the course of the academy, I was trained in the use/management of confidential sources, surveillance, undercover operations, tactical operations, drug identification, federal criminal law, and a variety of specific topics related to drug trafficking.

4.      I was previously a sworn member of the Fairfield Police Department from December 27, 2018, through March 27, 2022. I have participated in numerous criminal investigations involving violations of local criminal law. While participating in those investigations, I performed various tasks, including, but are not limited to: (a) conducting traffic stops of individuals in possession of narcotics; (b) interviewing witnesses, victims, and suspects during the course of calls for service; (c) assisting in the execution of and application for search and arrest warrants; and (d) conducting surveillance in relation to criminal complaints and problem areas in a local law enforcement capacity.

5.      As part of my duties, I am conducting an investigation, together with other law enforcement officers, into suspected criminal activity, including drug trafficking and related offenses, in and around New Haven County, by **WILSON GUZMAN, JR**. ("**GUZMAN**"), and suspected coconspirators still unknown or not yet fully identified.

6.      I am a co-case agent directing the investigation that is the subject of this affidavit.

7.      The investigation has employed several different investigative techniques, including, but not limited to:

    a.  the examination of records, including financial records, call detail records and motor vehicle records;

    b.  the use of pen registers and trap-and-trace devices;

    c.  the obtaining of precise location information;

    d.  physical surveillance and the use of pole cameras;

    e.  controlled purchases of drugs; and,

    8.    Based upon information learned by me as a result of my participation in this investigation, as well as information that I have determined to be accurate and reliable provided to me by other law enforcement officers, including my co-case agents in this investigation, I am familiar with the information discussed herein. Where the contents of documents or communications with others are reported herein, they are set forth in substance and part, unless otherwise indicated.

    9.    This affidavit is being submitted in support of applications for a warrant to arrest **GUZMAN**.  This affidavit is also being submitted in support of applications for warrants to search multiple locations, described more fully below and collectively referred to throughout this affidavit as the "**Subject Premises**." This affidavit is also being submitted in support of an application for a warrant to search **GUZMAN**'s vehicle, more described fully below and throughout this affidavit as the "**Subject Vehicle**."

    10.    As discussed more fully below, there is probable cause to believe, and I do believe, that **GUZMAN** has committed drug trafficking offenses in violation of 21 U.S.C. §§ 841(a)(1)(C) and 843(b), specifically, possession with intent to distribute and distribution of controlled substances, including but not limited to methamphetamine, fentanyl and cocaine, and use of a telephone in furtherance of a drug trafficking offense, and that fruits, instrumentalities, and evidence of these violations is set forth on the Attachments B-1, B-2, B-3, and B-4 to the warrants

sought herein, including but not limited to quantities of said controlled substances, or residue of these substances, drug paraphernalia, drug packaging materials, cash deriving from the sale of drugs, and/or documents and records relating to the aforementioned offenses, including records stored in electronic form, as well as telephones utilized in furtherance of these offenses, will be found within the **Subject Premises** and **Subject Vehicle** listed herein.

11.     **GUZMAN** has been identified in this case using various investigative methods, including but not limited to, physical surveillance, at times in conjunction with pole camera footage, review of records, including telephone service provider records, motor vehicle records, utility records, traffic stop body camera footage, voice identification, and law enforcement observations while purchasing controlled substances directly from **GUZMAN**. Investigators are familiar with **GUZMAN**'s appearance from reviewing his Department of Motor Vehicles license record and social media photographs and have identified him in multiple undercover purchases in which **GUZMAN** was the individual who sold undercover agents controlled substances. Further, investigators have reviewed body camera footage from a traffic stop, which is further described below, in which **GUZMAN**'s voice is clearly heard, and matched that voice to the one heard in multiple voice memos published by **GUZMAN** on his Telegram channel, which is also explained in greater detail below. In addition, through an administrative subpoena issued to **GUZMAN**'s telephone provider, investigators have confirmed that **GUZMAN** is using the phone number 203-999-2772.

12.     The **Subject Premises** for which search warrants are sought are as follows:

   a. **Subject Premises 1** is 25 Avalon Drive, Unit 2324, in Milford, Connecticut. **Subject Premises 1** is located on the second floor of a three-story beige building located in a multi-unit complex. The entrance to the second story of the building, which contains apartments, including **Subject Premises 1**, is located to the left side of the building. **Subject Premises 1** is believed to be **GUZMAN**'S primary residence.

   b. **Subject Premises 2** is 14 Gilbert Street, Unit M208, in West Haven, Connecticut. **Subject Premises 2** is located in a red brick commercial building that contains numerous studio business suites. **Subject Premises 2** has one main entrance from the Gilbert Street side that is clearly marked "14 Gilbert Street" above the glass doors with black metal trim. **GUZMAN** is believed to utilize **Subject Premises 2** as his "shop," and is believed to store bulk quantities of drugs, including fentanyl, and other items listed in Attachment A-2.

   c. **Subject Premises 3** is 59 Old Broadway East, Unit A-1, in North Haven, Connecticut. **Subject Premises 3** is a red brick and brown stucco commercial building with numerous individual units. More specifically, unit A-1 is a beige door with large bold black lettering to the right of the door that read "A-1" with a black mailbox affixed to the right of the door. **Subject Premises 3** is believed to be Wilson **GUZMAN**'S

secondary stash location that is advertised as a "distribution center for whales," where it is believed that **GUZMAN** is storing bulk quantities of drugs.

13.     The **Subject Vehicle** for which a search warrant is sought is a red Chevrolet Trailblazer bearing Connecticut License Plate AR65710.

14.     Because the information and evidence gathered during this investigation is voluminous, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth those facts which I believe are necessary to establish the existence of probable cause to support the requested warrants.

## II.     SUMMARY OF THE INVESTIGATION

15.     The DEA NHDO has conducted a long-term investigation of suspected drug trafficking in and around New Haven County, Connecticut, by Wilson **GUZMAN** and his suspected coconspirators.

16.     The investigation employed various investigative techniques, including but not limited to, controlled purchases of drugs from **GUZMAN**, the examination of records, including but not limited to financial records, call detail records, motor vehicle records and/or utility records, the gathering of precise location information utilizing a GPS unit affixed to **GUZMAN**'s car, the use of pole cameras, and physical surveillance.

17.     The aforementioned investigative techniques plainly establish the following:

18.     **GUZMAN** utilizes a mobile phone application called "Telegram," an encrypted instant messaging application that can be used to establish an online group. The online group functions similarly to social media application wherein users can subscribe to different channels. The owners of the channels have the ability to post content in the form of photo, video, voice memo, or text to their subscribers. The subscribers are able to "like" and "react" to messages in the form of emoticons.

19.     **GUZMAN** was operating two public Telegram channels that anyone who created a Telegram account could access and observe. **GUZMAN** later created a third channel that was not open to the public. Users wanting access to this channel had to go through a verification process and be invited. The names of the Telegram channels operated by **GUZMAN** are "Spitfire / Trappr Keeprz New England," "The Secret Menu," and, later on, "Secret Menu" (collectively referred to as the "Telegram Channels").

20.     **GUZMAN** distributes diverted or fake pharmaceuticals like oxycodone and Adderall, marijuana, and psilocybin mushrooms to an extensive client base of subscribers. Investigators have noted several posts from **GUZMAN** that indicate that **GUZMAN** is nationally and internationally distributing controlled substances.

21.     **GUZMAN**'s current stash locations are **Subject Premises 2** and **Subject Premises 3**. **GUZMAN** resides at **Subject Premises 1**.

22.     Undercover communications and "Telegram" application messages have found **GUZMAN** explicitly communicating about controlled substances. They have, for example, included the terms "cocaine" and "coke," used to refer to powder cocaine,

and "Addies" or "Adderall," used to refer to clandestinely manufactured Adderall pills. **GUZMAN** also explicitly posted drug names into his "Telegram" group, such as ecstasy, acid, and mushrooms.

## III.   TRAINING AND EXPERIENCE

23.   As indicated above, I have been a law enforcement officer for over 5 years, a year of which has been spent serving as a Special Agent in the DEA.

24.   During the course of my career in law enforcement, I have participated in numerous criminal investigations, including investigations involving suspected narcotics trafficking by individuals and organizations, gang activity, and violent crime.

25.   My participation in these investigations has included debriefing cooperating sources, as well as other local, state and federal law enforcement officers, regarding the manner and means employed by narcotics traffickers, including the manner in which narcotics traffickers obtain, store, manufacture, transport, package and distribute their illegal drugs, finance their distribution operations, and conceal, transport, and launder the corresponding drug proceeds.

26.   I have coordinated controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers. I have executed, and coordinated the execution of, numerous search and seizure and arrest warrants. I have conducted and coordinated electronic and physical surveillance of individuals involved in the illegal distribution of controlled substances. I have analyzed records documenting the illegal purchase of and sale of

controlled substances. I have testified in federal grand jury proceedings and in a federal trial which contributed to the conviction of a known drug trafficker and gang member.

27.    Based upon my training and experience, I am familiar with the practices employed by narcotics traffickers to secrete their drugs, drug proceeds, and records relating to drug trafficking in an effort to avoid detection. I know that drug traffickers, particularly drug traffickers who operate at a reasonably high level, often maintain and/or utilize multiple premises, each with a specific purpose, to facilitate their drug trafficking organization's operational interests as well as to protect their interests from their competition and elude law enforcement.

28.    I know that drug traffickers, particularly those who distribute a high volume of drugs and those who distribute drugs on a daily basis or with frequency, often store cash drug proceeds and records relating to their drug trafficking and drug proceeds, including but not limited to records regarding the disposition, transportation, or transfer of drug proceeds, as well as records regarding drug debts or records pertaining to the identity of coconspirators, within their residences or other structures over which they can exercise complete dominion and control and which they can attempt to secure with surveillance cameras or other security measure.

29.    I am also familiar with the manner and means by which narcotics traffickers communicate, as well as the devices commonly utilized by them, and those methods employed by narcotics traffickers in an effort to avoid detection by law enforcement.

30.     I know that narcotics traffickers often use cellular telephones and often speak to one another using coded, cryptic, or slang words and phrases in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets.

31.     I am familiar with the slang and coded conversation employed in the narcotics trade, and I know the wholesale and retail value and pricing associated with various controlled substances, including heroin, cocaine, cocaine base, oxycodone, and marijuana, and the manner in which these controlled substances are commonly packaged for wholesale and retail, i.e. "street-level," distribution.

32.     For example, Oxycodone is commonly sold in pills of 30mg strength that are blue in color and are commonly referred to as "blues" or phrases incorporating the word blue. Oxycodone pills are also sometimes referred to as "candies" or similar terms.

33.     Xanax pills are a pharmaceutical and are commonly referred to as "Zannies" or "Bars."

34.     As indicated above, during my tenure as a DEA Special Agent, I have investigated and participated in numerous operations which involved drug trafficking violations. Search warrants relating to these investigations have covered vehicles utilized by drug traffickers and their coconspirators, residences of drug traffickers and their coconspirators, premises and residences used by narcotics traffickers as "mills," where drugs are processed and packaged for re-distribution, "stash houses" used as storage locations for controlled substances, locations used as

points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

35.     Materials searched for and/or recovered in these locations have included various controlled substances and residue of controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs; records reflecting the names, addresses, and telephone numbers of coconspirators; sales receipts, travel records and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, computers and computer disks; and various valuable assets that were purchased with the proceeds of unlawful drug trafficking. Items obtained by search warrants of this nature constituted evidence of drug violations and related offenses.

36.     Based on my training, experience, and participation in this and other drug trafficking investigations, I also know that:

     a.  drug traffickers commonly conceal within their residences, controlled substances, diluents, drug paraphernalia, including packaging and processing materials, cash proceeds and items of value derived from drug trafficking, wireless telephones used in furtherance of drug trafficking, firearms, financial records and documents relating to the distribution of controlled substances, including ledgers, and records and

documents concerning transactions relating to transferring, storing, secreting, and spending money derived from drug trafficking, including receipts;

b.  drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement;

c.  drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

d.  even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

e.  drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug businesses;

f.  drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashiers' checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed;

g. drug traffickers commonly provide narcotics on consignment to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above-mentioned books, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

h. drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of current and past drug associates within their residences;

i. drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

j. drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashiers' checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

k. persons involved in drug trafficking who are aware of a criminal investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

l.  drug traffickers often have photographs, slides, or videos of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and videos are normally in the drug trafficker's possession or residence, and are often stored on a cellular telephone;

m. The State of Connecticut is generally viewed as a consumer state in regard to narcotic activity. It is common for drug traffickers to travel to major distribution centers such as New York, Massachusetts, or Florida to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. Drug traffickers' methods include, but are not limited to, the use of shipping companies, such as UPS or FedEx, commercial airlines, private motor vehicles, tractor trailer units, public transportation, motor vehicles with concealed compartments, and government and contract mail carriers. The residences of drug traffickers often contain records of drug related travel or shipping records. These records may include shipping receipts, airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

n.  drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including,

but not limited to, handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers' drugs, drug proceeds, and property;

o. it is a common practice for drug traffickers to store their drug proceeds, drug inventory, diluents, and drug related paraphernalia in their residences, including within safes or lock-boxes or other closed containers within their residences, or their cars, and it is also common for drug trafficker to store these items in the residences or cars of their trusted associates or "stash houses," owned or rented in a name other than their own; and,

p. when controlled substances, including but not limited to cocaine, methamphetamine, and fentanyl are stored within a premises or an automobile, residue of the controlled substance can remain in the storage location for months after the drugs themselves have been removed, and there exists a process pursuant to which investigators can collect as evidence residue of suspected controlled substances, and the residue can be laboratory tested to confirm, or rule out, the presence of a controlled substance in the residue;

q. drug traffickers often have, possess, maintain and control the items listed in Attachments B-1, B-2, B-3, and B-4 to the search warrants sought in this affidavit, in their homes, garages, out-buildings, cars, and

other premises to which they have access and/or over which they can exercise dominion and control.

## IV.   BASIS AND SCOPE OF INFORMATION

37.   I have personally participated in the investigation of the offenses that are the subject of this affidavit. The statements contained in this affidavit are based, in part, upon my personal knowledge and, in part, upon sources of information and belief. The sources of information and belief are, among other things:

a.  my training and experience;

b.  information, and oral and written reports, regarding this and other investigations which your affiant has received, directly or indirectly, from law enforcement authorities, including, but not limited to, Special Agents of the DEA, sworn members of the Task Force, other federal authorities, and detectives and officers of area police departments;

c.  physical surveillance conducted by law enforcement agents which has been reported to your affiant either directly or indirectly;

d.  pen register data and/or telephone call detail records, as well as telephone subscriber information;

e.  review of vehicle registration records and/or court records;

f.  location information associated with a GPS tracker on the **Subject Vehicle**;

g.  footage from pole cameras installed in the vicinity of **Subject Premises 2** and **Subject Premises 3**; and

h. other information that your affiant has reviewed and determined to be accurate and reliable.

## V.   UNDERCOVER AGENT ACTIVITES/CONTROLLED PURCHASES

38.   The term "Undercover Agent" ("UCA") is used herein to described Law Enforcement Personnel who are engaged in communications regarding controlled substances or directly purchasing controlled substances from **GUZMAN**.

39.   The DEA, to date, has obtained information primarily from an undercover agent ("UCA1") in this investigation. UCA1 has been in on and off contact with **GUZMAN** since May 2023.

40.   On or about May 3, 2023, UCA1 first established direct contact with **GUZMAN** via Telegram. UCA1 noted that M30 pills had been advertised on the "Secret Menu" Telegram channel. Therefore, on or about, May 17, 2023, UCA1 asked **GUZMAN** if M30 pills were still available. On or about June 1, 2023, **GUZMAN** indicated that M30 pills and Xanax were available via "drop shipment," meaning they would be shipped directly to UCA1 from a third party and **GUZMAN** would act as the facilitator. **GUZMAN** explained that "addies" (Adderall pills) were available directly from **GUZMAN**. The next day, on or about June 2, 2023, **GUZMAN** informed UCA1, via a voice memo, that the Adderall pills would be available for $5 per pill if UCA1 purchased 100 pills. **GUZMAN** elaborated that he had the pills in his possession, that the pills could be resold for $10 per pill, and that the pills would "get you high for like two days straight."

## CONTROLLED PURCHASE #1

41.     On or about June 6, 2023, UCA1 inquired about purchasing 100 Adderall pills from **GUZMAN** for $5 per pill. **GUZMAN** confirmed that he could supply the Adderall pills for $520.00 with shipping included. UCA1 provided **GUZMAN** with an undercover address located in Washington D.C. **GUZMAN** sent UCA1 a screen shot of the Cash App account that was to receive payment for the pills. The screen shot showed the Cash App account belonged to "Heywood Jablomi," which was linked to the Cash App username "$Callate371919." UCA1, utilizing an undercover Cash App account, sent $520.00 to the aforementioned Cash App account. After UCA1 sent the payment, **GUZMAN** provided a USPS tracking number for the package. On June 12, 2023, the pills were received at the DEA New Haven Task Force, seized, and logged into evidence. One of the Adderall pills was field tested, and it tested positive for the presence of methamphetamine.

## CONTROLLED PURCHASE #2

42.     On June 9, 2023, UCA1 and **GUZMAN** communicated regarding the purchase of "M30s." **GUZMAN** said that 1,000 M30 pills could be purchased for $3,000.00. UCA1 and **GUZMAN** continued to communicate about the quality of the pills and **GUZMAN** assured UCA1 that the M30 pills were of a high quality.

43.     On July 14, 2023, UCA1 asked **GUZMAN** if the M30 pills were still available at $3 per pill (1,000 pills for $3,000). **GUZMAN** replied that the pills were still available and that 1,000 pills were the minimum amount.

44.     On July 17, 2023, UCA1 advised **GUZMAN** that he would be ready to

purchase the M30 pills later in the day. **GUZMAN** provided the same Cash App payment information as the previous undercover purchase. UCA1 advised **GUZMAN** that he had $3,200 to spend and attempted to send it through Cash App to "Heywood Jablomi," which was linked to the Cash App username "$Callate371919." That transaction was denied based on a Cash App transaction limit. **GUZMAN** advised UCA1 that the other available payment methods would be Zelle, Apple Pay, and cash in the mail. UCA1 relayed that he could send the payment via Zelle. **GUZMAN** then sent UCA1 the phone number linked to **GUZMAN**'s Zelle account, 203-999-2772. **GUZMAN** then outlined the process that UCA1 would have to go through in order to send the required funds. **GUZMAN** relayed that UCA1 would have to send $2,500 through Zelle and $500 through Cash App. UCA1 sent $2,500 utilizing an undercover bank account through Zelle to the phone number 203-999-2772. It should be noted that an administrative subpoena of the cell phone number revealed that the subscriber was GUZMAN with a listed address of **Subject Premises 1**. UCA1 then sent $700 utilizing an undercover Cash App account to **GUZMAN**'s Cash App account. UCA1 told **GUZMAN** that the $3,200 payment was enough for 1,067 M30 pills. **GUZMAN** confirmed the transaction. A short time later, **GUZMAN** said that the pills would ship the next day after the Zelle payment cleared. Next, **GUZMAN** requested the address to send the pills to which UCA1 provided an address in Washington D.C.

45.     On July 20, 2023, **GUZMAN** sent UCA1 the tracking information for the M30 pills. On July 26, 2023, the package containing the M30 pills was received

at the DEA New Haven Task Force, seized, and logged into evidence. One of the M30 pills was field tested, and it tested positive for the presence of fentanyl.

## CONTROLLED PURCHASE #3

46.     On August 8, 2023, UCA1 advised **GUZMAN** that he had funds available to purchase a sample of mushrooms. UCA1 specifically asked for "shrooms" and "anything shroom related." UCA1 arranged for the meet to take place in the Ikea parking lot in New Haven, Connecticut. **GUZMAN** sent UCA1 a voice memo in which he, in sum and substance, apologized for running late and confirmed that he would go to Ikea. In a second voice memo, **GUZMAN** added that he would throw in a "free polka dot," which throughout this investigation law enforcement discovered to be a chocolate bar laced with psilocybin mushrooms. At approximately 1:19 P.M., surveillance was established on **Subject Premises 1**. A short time later, the **Subject Vehicle** was located parked in a parking lot near the residence.

47.     At approximately 1:30 P.M., **GUZMAN** exited the building while operating his cell phone and entered the **Subject Vehicle**. As **Subject Vehicle** exited the parking lot of **Subject Premises 1**, it was followed by law enforcement in the form of constant mobile vehicular surveillance. At approximately 1:55 P.M., **GUZMAN** left a voice memo for UCA1 stating, "I'm at the office now picking up the mushrooms and the polka dots I'll be there in less than ten minutes. I apologize, I'm very sorry that's why I'm giving him some free stuff." At approximately 1:56 P.M., the **Subject Vehicle** arrived at **Subject Premises 2**. **GUZMAN** was observed exiting the **Subject Vehicle** and entering **Subject Premises 2**.

48.     At approximately 1:58 P.M., **GUZMAN** sent another voice memo to UCA1 that stated, "Yeah just uh let him know I threw him uh a free polka dot bar valued at forty dollars for the wait so that's my bad I apologize again um I just grabbed everything I'm going to the Ikea let me just put this- the directions in I'm in West Haven so that's pretty close I am 9 minutes away" (it should be reiterated that **Subject Premises 2** is located in West Haven). Additionally, at approximately 1:59 P.M., law enforcement observed **GUZMAN** exit **Subject Premises 2** while holding a brown paper bag in his hand as he walked towards and entered the **Subject Vehicle**.

49.     Constant mobile surveillance continued as **GUZMAN** left **Subject Premises 2** in the **Subject Vehicle**. At approximately 2:07 P.M., UCA1 inquired about what **GUZMAN** would be driving, **GUZMAN** responded in a text that said "red truck." At Approximately 2:10 P.M., **GUZMAN** sent UCA1 a voice memo that stated "Pulling into the parking lot right now... he's parked in the parking lot where Ikea is?" At approximately 2:13 P.M., **GUZMAN** parked the **Subject Vehicle** near UCA2 and UCA3 and exited the driver's seat of the **Subject Vehicle**. **GUZMAN** approached the UC vehicle as UCA3 exited the UC vehicle. UCA3 handed **GUZMAN** $100, in return, **GUZMAN** handed UCA3 a brown paper bag marked with a "Trappr Keeprz" sticker, which contained one Ziploc bag filled approximately 53.98 gross grams of gray and brown mushrooms (which was field tested and produced positive results for the presence of psilocybin) and one Polka Dot Belgian white chocolate mushroom-laced candy bar.

50.     At approximately 2:13P.M., **GUZMAN** texted UCA1 "Done."
Surveillance units observed **GUZMAN** re-enter the **Subject Vehicle** and exit the
Ikea parking lot. At approximately 2:42 P.M., the **Subject Vehicle** arrived back at
**Subject Premises 2**. At approximately 3:20 P.M., **GUZMAN** exited the **Subject
Vehicle** and entered **Subject Premises 2**.

### CONTROLLED PURCHASE #4

51.     On August 23, 2023, UCA1 had previous conversations with **GUZMAN**
for the price of what a whole unit of psilocybin mushrooms would cost. UCA1 was
advised $850 dollars for a whole unit, which is equivalent to one pound. UCA1 also
asked if **GUZMAN** had any "Addies or E." **GUZMAN** responded to UCA1 in a voice
memo that he had thousands of "Addies" and the cost varies on the quantity
purchases. UCA1 advised **GUZMAN** that his guys (UCA2 and UCA3) would be in
the New Haven area in the afternoon and agreed to meet to sell a unit of psilocybin
mushrooms for $850 dollars and a sample of Adderall pills for $150 dollars.

52.     At approximately 2:30 P.M., surveillance was established at **Subject
Premises 1** and the **Subject Vehicle**. At approximately 4:12 P.M., investigators
observed **GUZMAN** exiting **Subject Premises 1** carrying a large blue bag that he
placed in the trunk of the **Subject Vehicle**. **GUZMAN** then departed the area in the
**Subject Vehicle** where mobile surveillance was established. **GUZMAN** was
followed to **Subject Premises 2**.

53.     Investigators observed **GUZMAN** exit the **Subject Vehicle** and jog to
the front doors of **Subject Premises 2,** which he then entered. Approximately three

minutes later, **GUZMAN** was observed exiting **Subject Premises 2** carrying a white bag in his hand. **GUZMAN** then entered the **Subject Vehicle** and mobile surveillance followed **GUZMAN** to the Ikea parking lot, located at 450 Sargent Drive, in New Haven.

54.     At approximately 4:50 P.M., **GUZMAN** pulled alongside UCA2 and UCA3's vehicle and rolled down the windows of the **Subject Vehicle**. **GUZMAN** was observed handing the white USPS bag that contained approximately one pound of psilocybin mushrooms to UCA3. After a quick conversation between **GUZMAN** and UCA3, UCA3 handed the white USPS bag containing the psilocybin mushrooms back to **GUZMAN**. UCA2 asked **GUZMAN** if he had the "Addies" on his person, which he did not. **GUZMAN** advised UCA 2 and UCA3 to follow him back to West Haven so he can get him the pills.

55.     Under mobile surveillance UCA2 and UCA3 followed **GUZMAN** and the subject vehicle to the Dairy Queen parking lot located at 64 Boston Post Road in West Haven. At approximately 5:02 P.M., UCA2 and UCA3 were advised to wait in the parking lot as **GUZMAN** and the subject vehicle departed the Dairy Queen lot. Surveillance units followed **GUZMAN** and the **Subject Vehicle** back to **Subject Premises 2**. **GUZMAN** is observed exiting the **Subject Vehicle** and entered **Subject Premises 2**. Approximately two minutes later **GUZMAN** is observed exiting **Subject Premises 2** holding a small package in his left hand. **GUZMAN** then entered the **Subject Vehicle** and returned to the Dairy Queen lot and parked directly next to the UCA's vehicle.

56.     UCA3 who was already outside the vehicle, walked up to the **Subject Vehicle** driver side window where **GUZMAN** handed UCA3 one white USPS postal bag containing approximately 483.46 gross grams of psilocybin mushrooms and one glass container that contained 47.5 Adderall pills that weighed approximately 71.22 gross grams. **GUZMAN** then departed the Dairy Queen parking lot in the **Subject Vehicle** where he immediately returned back to **Subject Premises 2**. **GUZMAN** was observed exiting the **Subject Vehicle** and retrieved a blueish colored bag from the trunk of the **Subject Vehicle** and walked inside **Subject Premises 2**.

57.     It should be noted that the aforementioned undercover activity is only a sampling of the conversations that have led to controlled purchases. UCA1 has documented numerous other conversations in which **GUZMAN** has explicitly mentioned the sale and distribution of controlled substances.

## VI.   ADDITIONAL INFORMATION REGARDING THE SUBJECT PREMISES

58.     Pertinent facts and communications pertaining to the Subject Premises and/or **GUZMAN** have been set forth in the preceding sections of this affidavit.

59.     Additional information relating to the **Subject Premises** and the **Subject Vehicle** for which search warrants are sought is set forth below.

60.     The summaries of surveillance operations set forth below often include interpretive belief statements from your affiant, which is based upon the training,

experience, and knowledge of the affiant and agents working on this case, including knowledge gained through this investigation.

### Additional Information Pertaining to Subject Premises 1

61.    The totality of the investigation described in this affidavit establishes probable cause to believe that Wilson **GUZMAN** distributes narcotics, including fentanyl, cocaine, and methamphetamine, and distributes diverted or fake pharmaceuticals like Oxycodone and Adderall, to a broad customer base, with the assistance of several coconspirators.

62.    Based upon on my training, experience, the totality of this investigation, and my knowledge of it, along with coordinated surveillance and controlled purchases, I believe that a) **Subject Premises 1** is **GUZMAN**'s primary residence, and b) evidence of drug trafficking offenses, including but not limited to controlled substances, residue of controlled substances, as well as drug packaging material and paraphernalia, is located within **Subject Premises 1**.

63.    This conclusion is supported, in part, by the events of July 13, 2023, and August 8, 2023.

64.    On July 13, 2023, **GUZMAN** traveled from **Subject Premises 1** to multiple locations of interest including **Subject Premises 2** and **Subject Premises 3**. **GUZMAN** also traveled to a post office and was seen carrying boxes throughout the surveillance operation.

65.     On August 8, 2023, **GUZMAN** left **Subject Premises 1** and traveled to **Subject Premises 2** prior to distributing a controlled substance directly to UCA2 and UCA3.

### Events of July 13, 2023

66.     On July 13, 2023, surveillance of **GUZMAN** was established at **Subject Premises 1**. At approximately 9:20 A.M., law enforcement located the **Subject Vehicle** parked in the complex parking lot near **Subject Premises 1**. At approximately 1:00 P.M., **GUZMAN** exited the common door of **Subject Premises 1** and placed a small white bag of trash by the side of the common entrance. At approximately 1:18 P.M., a trash pull operation was undertaken, which yielded nothing of evidentiary value. At approximately 1:46 P.M., **GUZMAN** exited the common entrance for **Subject Premises 1** and entered the **Subject Vehicle**. The **Subject Vehicle** was followed via mobile vehicular surveillance to **Subject Premises 2**. At approximately 2:40 P.M, **GUZMAN** exited the **Subject Vehicle** and entered **Subject Premises 2**. A short time later **GUZMAN** exited empty-handed, reentered the **Subject Vehicle**, and traveled to **Subject Premises 3**.

67.     At approximately 3:11 P.M., the **Subject Vehicle** was observed parked in front of **Subject Premises 3**. A short time later, the **Subject Vehicle** left **Subject Premises 3** and traveled to several businesses in the area of Washington Avenue in North Haven, CT. At approximately 3:40 P.M., the **Subject Vehicle** parked in the rear of the North Haven United States Post Office, located at 74 Washington Avenue

in North Haven, CT. **GUZMAN** exited the **Subject Vehicle** and entered the post office while speaking on the phone.

68.     At approximately 3:48 P.M., **GUZMAN** exited the post office carrying a box in his hand. **GUZMAN** placed the box into the **Subject Vehicle** and proceeded to speak on the phone outside for several minutes. **GUZMAN** traveled back to **Subject Premises 3** where he placed several boxes from the **Subject Vehicle** into **Subject Premises 3**. At approximately 4:10 P.M., **GUZMAN** entered the **Subject Vehicle** and traveled to **Subject Premises 1**.

69.     At approximately 4:51 P.M., the **Subject Vehicle** parked in front of **Subject Premises 1**, a short time later, **GUZMAN** exited **Subject Premises 1** carrying a box that appeared to be weighted. **GUZMAN** placed the weighted box into the **Subject Vehicle** and entered it himself. At approximately 4:58 P.M., the **Subject Vehicle** traveled to the Pilot Gas Station (433 Old Gate Lane in Milford). **GUZMAN** was observed meeting with a Hispanic male. **GUZMAN** and the male exchanged a red cooler in the parking lot and departed. After the meeting with the Hispanic male, the **Subject Vehicle** traveled to **Subject Premises 3**. At approximately 5:34 P.M., surveillance was terminated.

70.     After surveillance was terminated, at approximately 5:36 P.M., the "Spitfire / Trappr Keeprz New England" Telegram channel posted a video of a warehouse containing numerous pallets piled with stacked boxes. Later, at approximately 5:43 P.M., **GUZMAN** posted a voice memo to the Telegram channel that stated, "I gotta go through some big ass loads I'll be listing everything real soon

guys." In the background of the aforementioned voice message, a GPS voice can be heard saying "turn left onto Washington Avenue." As previously mentioned, **GUZMAN** was traveling on Washington Avenue at multiple points in the surveillance operation.

71.     The above stated facts establish **GUZMAN**'s frequented locations and confirm his usage of the United States Post Office. Additionally, **GUZMAN** was seen handling packages, which are suspected to contain controlled substances or materials related to **GUZMAN**'s illicit business, based on prior Telegram posts and undercover operations in which those items were sent through the mail. These packages were loaded into the **Subject Vehicle** from **Subject Premises 1** and **Subject Premises 3**.

### Events of August 8, 2023

72.     As indicated above, on August 8, 2023, **GUZMAN** departed from **Subject Premises 1** and traveled to **Subject Premises 2** to retrieve narcotics that he eventually sold to undercover law enforcement officers. This interaction along with the others listed above establish that **GUZMAN** uses **Subject Premises 1** as a starting point and a safe place to originate his distribution of controlled substances.

73.     I know that drug traffickers, particularly drug traffickers who distribute the volume of drugs that **GUZMAN** distributes, with the frequency of **GUZMAN**'s distribution activities, often maintain and/or utilize multiple premises, each with a specific purpose, to facilitate the drug trafficking organization's operational interests as well as to protect their interests from their competition and elude law enforcement.

74.     In this case, **GUZMAN**'s principal stash locations at which bulk quantities of drugs are secreted are believed to be **Subject Premises 2** and **Subject Premises 3**. The involvement of these locations is explained in further detail below.

75.     Accordingly, there is probable cause to believe, and I do believe, that controlled substances and/or residue of controlled substances, including marijuana, Oxycodone, Adderall, Fentanyl, Methamphetamine, and mushrooms, drug paraphernalia, including drug packaging material, cash drug proceeds, records relating to drug trafficking, as well as other evidence of the drug trafficking offenses set forth in this affidavit, and items listed in Attachment B-1 to the warrant for **Subject Premises 1**, will be found within **Subject Premises 1**.

### Additional Information Pertaining to Subject Premises 2

76.     Numerous Telegram posts, surveillance, and controlled purchases, several of which are set forth in this affidavit, establish probable cause to believe that **GUZMAN** is a bulk fentanyl, methamphetamine, and marijuana distributor.

77.     As explained more fully below, there is probable cause to believe, and I do believe, that **GUZMAN** has used, and is using, **Subject Premises 2** as his "shop," where bulk quantities of fentanyl, methamphetamine, and marijuana are processed and packaged for redistribution. The specific unit number at **Subject Premises 2** was established after an administrative subpoena found that unit number M208 was rented to Apex Marketing Services, with the email address listed was WGUZMAN1984@GMAIL.COM.   On July 3, 2023, law enforcement queried Apex Marketing Services in open-source databases. The query revealed that Apex

Marketing Services had W. Guzman listed as the principal owner. Also, the business address corresponded to a previous address for GUZMAN in East Haven.

78.     This belief is based upon the totality of the investigation, including but not limited to, my training and experience, physical surveillance, and pole camera footage of **GUZMAN** at **Subject Premises 2**, and the multiple controlled purchases where **GUZMAN** was observed at **Subject Premises 2** and advised UCA1 he was at the shop in West Haven.

79.     **GUZMAN** is believed to have dominion and control over **Subject Premises 2**. Since November of 2022, he has been observed on pole camera footage entering and exiting 14 **Subject Premises 2** on a regular basis and would post on Telegram that the "Shop is Open." He has been observed scanning a key card near the front door of the business complex to allow him entry inside.

### Continued Observations at Subject Premises 2

80.     Investigators learned that on September 13, 2022, there was a USPS parcel scheduled to be delivered at **GUZMAN**'s former residence in East Haven, Connecticut. Investigators established surveillance at the residence. During the course of surveillance, **GUZMAN** departed the residence in the **Subject Vehicle**. **GUZMAN** was followed to **Subject Premises 2** where he met with another male and entered the commercial business and remained inside for a lengthy period of time before surveillance was terminated.

81.     On October 5, 2022, at approximately 4:30 P.M., investigators received an alert from the "Spitfire / Trappr Keeprz New England" Telegram channel that the

"Shop is Open." Investigators relocated to **Subject Premises 2** and observed the **Subject Vehicle** parked across the street of **Subject Premises 2**.

82.    On November 8, 2022, investigators received an alert from the "Spitfire / Trappr Keeprz New England" Telegram channel that the "Shop" will be open around 5:00 P.M. At approximately 8:30 P.M., case agents drove past **Subject Premises 2** and observed the **Subject Vehicle** parked facing the wrong direction on Gilbert Street. Shortly thereafter, **GUZMAN** posted a voice message in the "Spitfire / Trappr Keeprz New England" Telegram channel that he is getting orders and boxes ready to be delivered to his customers.

83.    On November 9, 2022, investigators conducted a search through the West Haven Police Department's License Plate Reader (LPR) system of any hits on the **Subject Vehicle**. The LPR query yielded a total of ten results for the vehicle from the date range of August 2022 through November 2022. Five of the vehicle hits placed the vehicle in the area of Gilbert Street and one other hit was in front of the West Haven Post Office located at 589 Campbell Avenue.

84.    On July 13, 2023, investigators conducted surveillance on **GUZMAN** in front of **Subject Premises 1**. As stated above in further detail, **GUZMAN** was followed from his residence (**Subject Premises 1**) and arrived at **Subject Premises 2**. **GUZMAN** was observed exiting the **Subject Vehicle** and entering **Subject Premises 2** by scanning through the front door with a key card. **GUZMAN** was briefly inside **Subject Premises 2** before exiting the front entrance of **Subject Premises 2**. **GUZMAN** was then followed to North Haven and observed stopping at

59 **Subject Premises 3**. **GUZMAN** was followed departing **Subject Premises 3** and stopped at the North Haven Post Office located at 74 Washington Avenue. **GUZMAN** was observed entering the post office for a short period of time before and carrying a box. The box that **GUZMAN** retrieved was consistent with his posts from the Telegram channels and pole camera surveillance. **GUZMAN** was then followed from the post office where he then arrived back at **Subject Premises 3** and was observed unloading numerous boxes from the **Subject Vehicle**.

85.     On August 4, 2023, at approximately 5:32 P.M., investigators observed on the pole camera the **Subject Vehicle** parked across the street from **Subject Premises 2**. A male wearing dark clothing later identified as **GUZMAN** was observed exiting the **Subject Vehicle** and entering the front entrance of **Subject Premises 2**.

86.     At approximately 6:14 P.M., **GUZMAN** exited **Subject Premises 2** alongside an unidentified male wearing a white shirt, dark shorts, and a dark baseball hat. The unidentified male was observed carrying a black bag, which appeared to be weighted and mostly full. Both **GUZMAN** and the unidentified male walked towards the **Subject Vehicle** as **GUZMAN** is observed opening the rear driver side door and closing it. The unidentified male then walks away from the **Subject Vehicle** towards a blue Toyota Sedan. The unidentified male is then observed placing a black bag, which appeared to be less full and less weighted, in the rear driver side door before entering the vehicle and departing the area of **Subject Premises 2**.

87.     As the Toyota sedan was observed departing the area, **GUZMAN** remained on the street using a cellular telephone. Investigators arrived on scene and then began conducting physical surveillance in addition to the continued use of the pole camera. **GUZMAN** was then observed entering the front seat of the **Subject Vehicle**, which remained stationary across the street from **Subject Premises 2**.

88.     At approximately 6:22 P.M., a red Toyota FJ Cruiser was observed parking in front of **Subject Premises 2**. An unidentified male wearing a tan vest over a dark shirt and tan shorts exited the vehicle and walked towards **Subject Premises 2**. **GUZMAN** is observed exiting the **Subject Vehicle** and walking towards the entrance of **Subject Premises 2** where he greets the unidentified male. Both **GUZMAN** and the unidentified male did not appear to be holding any objects. They were observed entering the front door to **Subject Premises 2**.

89.     At approximately 6:47 P.M., **GUZMAN** and the unidentified male exit the door to **Subject Premises 2**. The unidentified male is seen carrying a red bag and a cardboard box. The unidentified male is seen walking towards the **Subject Vehicle** with **GUZMAN** and is observed placing the cardboard box in the trunk of the **Subject Vehicle**. The unidentified male then walks towards the Toyota FJ Cruiser and is seen entering the vehicle while still holding the red bag. **GUZMAN** is then observed entering the **Subject Vehicle** and departing the area in tandem with the Toyota FJ Cruiser.

90.     Investigators followed **GUZMAN** and the **Subject Vehicle** where he was observed driving through a red light at the intersection of the Boston Post Road

and Campbell Avenue in West Haven. West Haven Police Department Sergeant Marchitto who observed the red-light violation conducted a motor vehicle stop on the **Subject Vehicle**. Wilson **GUZMAN** was identified as the sole occupant of the vehicle where he was issued a verbal warning for the traffic signal violation.

91.    Based on the above cited information investigators believe that **GUZMAN** is utilizing **Subject Premises 2** to further his drug trafficking organization. Also, investigators believe that the property is likely a stash location where **GUZMAN** stores some of his many forms of controlled substances.

92.    Accordingly, there is probable cause to believe, and I do believe, that controlled substances and/or residue of controlled substances, including including marijuana, Oxycodone, Adderall, Fentanyl, Methamphetamine, and mushrooms, drug paraphernalia, including drug packaging material, cash drug proceeds, records relating to drug trafficking, as well as other evidence of the drug trafficking offenses set forth in this affidavit, and items listed on Attachment B-2 to the warrant for **Subject Premises 2**, will be found within **Subject Premises 2**.

**Additional Information Pertaining to Subject Premises 3**

93.    Based upon on my training, experience, the totality of this investigation and my knowledge of it, along with coordinated surveillance and controlled purchases, I believe that a) **Subject Premises 3** is one of **GUZMAN**'s stash locations, and b) evidence of drug trafficking offenses, including but not limited to controlled substances, residue of controlled substances, as well as drug packaging material and paraphernalia are located within **Subject Premises 3**.

94.     This conclusion is supported, in part, by the events of July 13, 2023, August 2, 2023, and August 17, 2023.

95.     On July 13, 2023, **GUZMAN** traveled to **Subject Premises 3** after law enforcement observed **GUZMAN** travel to a Post Office. **GUZMAN** was seen carrying boxes throughout the surveillance operation, specifically into **Subject Premises 3** on the above date. Specifics of this encounter were related in an earlier section of this affidavit.

96.     On August 2, 2023, **GUZMAN** was observed, via pole camera, parked in front of **Subject Premises 3**. **GUZMAN** removed a large, weighted box from the trunk of the **Subject Vehicle** and brought it inside **Subject Premises 3**. **GUZMAN** also retrieved a box from **Subject Premises 3** and placed it into the **Subject Vehicle**.

97.     On August 17, 2023, **GUZMAN** was observed parked in front of **Subject Premises 3**. **GUZMAN** placed a box from **Subject Premises 3** into the trunk of the **Subject Vehicle**. **GUZMAN** then traveled a short distance and met with a black male, and the two conducted a hand-to-hand transaction from the trunk of the **Subject Vehicle**. Later, law enforcement conducted an investigative stop on the black male, and he was confronted about the interaction with **GUZMAN**. The black male was found to have packaged marijuana inside his vehicle. Additionally, the black male was found to have a message from "Spitfire / Trappr Keeprz New England Telegram" channel on the notifications screen of his phone.

### Events of August 2, 2023

98.     As indicated above, on August 2, 2023, investigators used a pole camera, which had a view of **Subject Premises 3**, to observe the **Subject Vehicle** parked in front of **Subject Premises 3**. At approximately 9:43 P.M., the **Subject Vehicle** arrived and parked in front of **Subject Premises 3**. **GUZMAN** exited the **Subject Vehicle** and entered **Subject Premises 3**. He remained inside for a short time and then reemerged. **GUZMAN** opened the trunk of the **Subject Vehicle** and removed a large, weighted box, which he placed inside of **Subject Premises 3**. **GUZMAN** exited **Subject Premises 3** with a box that appeared to be lighter and placed it in the trunk of the **Subject Vehicle**. A short time later, **GUZMAN** departed the area inside the **Subject Vehicle**.

### Events of August 17, 2023

99.     As indicated above, on August 17, 2023, law enforcement received a geolocation alert that the GPS tracker was in the area of **Subject Premises 3**. [1]Based on the alert, law enforcement established surveillance on **Subject Premises 3**.

100.    At approximately 5:32 P.M., physical surveillance was established at **Subject Premises 3**, where the **Subject Vehicle** was observed parked in front of unit A-1.

---

[1] On August 16, 2023, a GPS tracking warrant for the Subject Vehicle was signed by United States Magistrate Judge Maria E. Garcia. The GPS tracker was installed on August 17, 2023, and has been monitored by investigators since.

101.    At approximately 5:48 P.M., investigators observed **GUZMAN** wearing a black shirt as he placed a black bag in the rear driver side of the **Subject Vehicle**. Investigators conducted surveillance of **GUZMAN** and his vehicle as he was observed pulling into the back parking lot of **Subject Premises 3**. Approximately three minutes later, **GUZMAN** is observed exiting the back parking lot of **Subject Premises 3**. **GUZMAN** was followed to Interstate 91 south where he was observed exiting off exit 8 in New Haven. Investigators observed **GUZMAN** and the **Subject Vehicle** parked in the rear of the Popeyes Chicken restaurant, located at 350 Foxon Boulevard in New Haven.

102.    At approximately 6:11 P.M., investigators observed **GUZMAN** open the trunk to the **Subject Vehicle** and he was seen going to and from the trunk and the left rear door. A short time later, investigators observed a light skinned black male wearing a blue bandana walk up to **GUZMAN** and engage in conversation at the rear trunk of the **Subject Vehicle**. Both **GUZMAN** and the unidentified male were observed looking into the trunk of the **Subject Vehicle**. Investigators observed the unidentified black male walk away from the **Subject Vehicle** and walk towards several parked cars in the lot. The unidentified male then returned to the **Subject Vehicle** with a multi-colored book bag. Investigators observed the unidentified male retrieve items from the trunk of the **Subject Vehicle** where he then placed them inside the multi-colored book bag. The unidentified male then walked away from the **Subject Vehicle** where he was observed entering a blue Mazda bearing Pennsylvania registration plates.

103.   At approximately 6:19 P.M., **GUZMAN** was observed entering the **Subject Vehicle** and departing the Popeyes parking lot. Once **GUZMAN** was out of the area, investigators maintained surveillance on the unidentified male in the blue Mazda. An investigative stop was conducted on the unidentified male in the blue Mazda and investigators located the multi-colored book bag in the trunk of the vehicle that contained numerous pre-packaged bags that further contained a green leafy substance of suspected marijuana. While conducting a search of the unidentified male's vehicle, investigators located his cellular telephone. On the cellular telephones home screen investigators observed a notification from the Telegram application, more specifically a posting from the "Spitfire / Trappr Keeprz New England" Telegram channel.

104.   Based on the above cited information, investigators believe that **GUZMAN** is utilizing **Subject Premises 3** to further his drug trafficking organization. Also, that the property is likely a stash location where **GUZMAN** stores some of his many forms of controlled substances.

105.   Accordingly, there is probable cause to believe, and I do believe, that controlled substances and/or residue of controlled substances, including marijuana, Oxycodone, Adderall, Fentanyl, Methamphetamine, and mushrooms, drug paraphernalia, including drug packaging material, cash drug proceeds, records relating to drug trafficking, as well as other evidence of the drug trafficking offenses set forth in this affidavit, and items listed on Attachment B-3 to the warrant for **Subject Premises 3**, will be found within **Subject Premises 3**.

**Additional Information Pertaining to Subject Vehicle**

106.     Based upon on my training, experience, the totality of this investigation and my knowledge of it, along with coordinated surveillance and controlled purchases, I believe that a) the **Subject Vehicle** is **GUZMAN**'s primary vehicle, and b) evidence of drug trafficking offenses, including but not limited to controlled substances, residue of controlled substances, as well as drug packaging material and paraphernalia are located within the **Subject Vehicle**.

107.     This conclusion is supported, in part, by the aforementioned events of July 13, 2023, August 2, 2023, August 4, 2023, August 17, 2023, and August 23, 2023. The observations made on August 4, 2023, further tie **GUZMAN** to the **Subject Vehicle** and to the multitude of voice memos posted to the Telegram Channels.

108.     As mentioned earlier in this affidavit, on July 13, 2023, **GUZMAN** was observed handling multiple boxes and taking them in and out of the **Subject Vehicle**.

109.     As previously mentioned, on August 8, 2023, **GUZMAN** traveled to a suspected stash location in the **Subject Vehicle**, from which he retrieved a controlled substance. **GUZMAN** then transported and sold the controlled substance directly to undercover law enforcement while operating the **Subject Vehicle**.

110.     As previously mentioned, on August 4, 2023, **GUZMAN** was observed speaking with multiple people outside **Subject Premises 2** and was observed entering **Subject Premises 2** with an unknown male. **GUZMAN** entered the **Subject Vehicle** and began to drive on the streets of West Haven. **GUZMAN**

committed a traffic violation while operating the **Subject Vehicle** and a traffic stop was conducted. **GUZMAN** identified himself as Wilson **GUZMAN** and investigators took note that **GUZMAN**'s voice matched all prior voice memos sent through Telegram.

111.   As mentioned earlier in this affidavit, on August 17, 2023, law enforcement observed **GUZMAN** place an item into the trunk of the **Subject Vehicle**. **GUZMAN** then used the **Subject Vehicle** to drive to another location in which he conducted a suspected hand to hand transaction from the trunk of the **Subject Vehicle**.

112.   As previously mentioned, on August 23, 2023, **GUZMAN** traveled to a suspected stash location in the **Subject Vehicle** and retrieved a controlled substance. **GUZMAN** then transported and sold the controlled substance directly to undercover law enforcement while operating the **Subject Vehicle**. **GUZMAN** spoke with undercover law enforcement and then directed undercover law enforcement to follow him so **GUZMAN** could retrieve other controlled substances which he had secreted at **Subject Premises 2**. Undercover law enforcement followed the **Subject Vehicle** to a secondary location. **GUZMAN** used the **Subject Vehicle** to then go to **Subject Premises 2**, obtain the controlled substance, and then return to the secondary location to sell undercover law enforcement the controlled substance.

113.   I know that drug traffickers, particularly drug traffickers who distribute the volume of drugs that **GUZMAN** distributes, with the frequency of **GUZMAN**'s distribution activities, often utilize their vehicles to transport and store narcotics to

facilitate the drug trafficking organization's operational interests as well as to protect their interests from their competition and elude law enforcement.

114.   Accordingly, there is probable cause to believe, and I do believe, that controlled substances and/or residue of controlled substances including, Marijuana, Oxycodone, Adderall, Fentanyl, Methamphetamine, and mushrooms, drug paraphernalia, including drug packaging material, cash drug proceeds, records relating to drug trafficking, as well as other evidence of the drug trafficking offenses set forth in this affidavit, and items listed on Attachment B-4 to the warrant for the **Subject Vehicle**, will be found within the **Subject Vehicle**.

## VI.   CONCLUSION

115.   On the basis of the foregoing, I have probable cause to believe, and do believe, that evidence, as more fully described in Attachments B-1, B-2, B-3, and B-4, of violations of 21 U.S.C. §§ 841(a)(1)(C) and 843(b), will be found in the locations described in Attachments A-1, A-2, A-3, and A-4.

Respectfully submitted,

ALEX
MACNAMARA
Digitally signed by ALEX
MACNAMARA
Date: 2023.09.01 11:03:13
-04'00'

Alex MacNamara
Special Agent
Drug Enforcement Administration

[ADDITIONAL SIGNATURE PAGE FOLLOWS]

The truth of the foregoing affidavit has been attested to me by DEA Special Agent Alex MacNamara over the telephone on September 1, 2023 .

Robert M. Spector
Digitally signed by Robert M. Spector
Date: 2023.09.01 14:21:34 -04'00'

_____

HONORABLE ROBERT M. SPECTOR
United States Magistrate Judge

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched is 25 Avalon Drive, Unit 2324, in Milford, Connecticut ("Subject Premises 1"). Subject Premises 1 is located on the second floor of a three-story beige building located in a multi-unit complex. The entrance to the second story of the building, which contains apartments, including Subject Premises 1, is located to the left side of the building.

 

## ATTACHMENT B-1

### Items to be Seized

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1)(C) (possession with intent to distribute and distribution of controlled substances) and 843(b) (use of a telephone in furtherance of a drug trafficking offense), and involve WILSON GUZMAN, JR. ("GUZMAN"), including:

a. Controlled substances, including marijuana, oxycodone, Adderall, fentanyl, methamphetamine, and mushrooms;

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol mannite, vitamin B-12, and inositol;

c. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e. Items of personal property that pertain to the identity of the person(s) within the premises and occupancy, control, or ownership of the premises,

including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

f.  Documents indicating interstate travel, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel and car rental statements, correspondence with travel agencies and other travel-related businesses, airline, rental car, and hotel receipts, frequent flyer or user cards and statements, telephone bills, photographs/video tapes, and other papers relating to domestic and international travel, including computerized records;

g.  Cellular/digital wireless telephones and "smart" cellular telephones owned, possessed, or used by GUZMAN and capable of running the Telegram application;

h.  Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.  Firearms and ammunition;

j.  Records of banking, financial, and investment accounts for GUZMAN, including statements, checks, check stubs or registers, deposit slips and deposit items, withdrawal slips, cancelled checks, cashier's checks, money

orders, wire transfer documents, loan records, mortgage records, financial statements, credit card statements, safe deposit box rental and payment documents, and safe deposit box keys;

k. Any and all business records, including general ledgers and subsidiary ledgers, cash receipts journals, cash disbursement journals, petty cash journals, appointment books, calendars, passbooks, invoices, written estimates, receipts, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, point-of-sale (POS) system hardware and records, computerized bookkeeping software and files;

l. Any and all copies of and/or original federal and state income tax, payroll tax, sales tax, and informational returns, including amended federal and state income tax, payroll tax, and sales tax returns, as well as any and all records used in, or resulting from, the preparation and filing of federal and state income tax, payroll tax, and sales tax returns, consisting of but not limited to work-papers, notes, papers, memoranda and correspondence;

m. Credit card records, including application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and methods (cash or check) of repayment, checks used to make repayments (front and back);

n.  Records of purchases of bank checks, cashier, teller, travelers check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders;

o.  Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through a bank, savings bond transactions and investment accounts. Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions; and

p.  Records and tangible items related to the source, collection, use and/or secretion of assets or cash, including cash and United States Currency in excess of $2,000.

## <u>ATTACHMENT A-2</u>

### Property to be Searched

The property to be searched is 14 Gilbert Street, Unit M208, in West Haven, Connecticut ("Subject Premises 2").   Subject Premises 2 is located in a red brick commercial building that contains numerous studio business suites. Subject Premises 2 has one main entrance from the Gilbert Street side that is clearly marked "14 Gilbert Street" above the glass doors with black metal trim.




## ATTACHMENT B-2

### Items to be Seized

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1)(C) (possession with intent to distribute and distribution of controlled substances) and 843(b) (use of a telephone in furtherance of a drug trafficking offense), and involve WILSON GUZMAN, JR. ("GUZMAN"), including:

a. Controlled substances, including marijuana, oxycodone, Adderall, fentanyl, methamphetamine, and mushrooms;

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol mannite, vitamin B-12, and inositol;

c. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e. Items of personal property that pertain to the identity of the person(s) within the premises and occupancy, control, or ownership of the premises,

including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

f.  Documents indicating interstate travel, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel and car rental statements, correspondence with travel agencies and other travel-related businesses, airline, rental car, and hotel receipts, frequent flyer or user cards and statements, telephone bills, photographs/video tapes, and other papers relating to domestic and international travel, including computerized records;

g.  Cellular/digital wireless telephones and "smart" cellular telephones owned, possessed, or used by GUZMAN and capable of running the Telegram application;

h.  Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.  Firearms and ammunition;

j.  Records of banking, financial, and investment accounts for GUZMAN, including statements, checks, check stubs or registers, deposit slips and deposit items, withdrawal slips, cancelled checks, cashier's checks, money

orders, wire transfer documents, loan records, mortgage records, financial statements, credit card statements, safe deposit box rental and payment documents, and safe deposit box keys;

k.  Any and all business records, including general ledgers and subsidiary ledgers, cash receipts journals, cash disbursement journals, petty cash journals, appointment books, calendars, passbooks, invoices, written estimates, receipts, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, point-of-sale (POS) system hardware and records, computerized bookkeeping software and files;

l.  Any and all copies of and/or original federal and state income tax, payroll tax, sales tax, and informational returns, including amended federal and state income tax, payroll tax, and sales tax returns, as well as any and all records used in, or resulting from, the preparation and filing of federal and state income tax, payroll tax, and sales tax returns, consisting of but not limited to work-papers, notes, papers, memoranda and correspondence;

m. Credit card records, including application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and methods (cash or check) of repayment, checks used to make repayments (front and back);

n. Records of purchases of bank checks, cashier, teller, travelers check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders;

o. Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through a bank, savings bond transactions and investment accounts. Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions; and

p. Records and tangible items related to the source, collection, use and/or secretion of assets or cash, including cash and United States Currency in excess of $2,000.

## <u>ATTACHMENT A-3</u>

**Property to be Searched**

The property to be searched is 59 Old Broadway East, Unit A-1, in North Haven, Connecticut ("Subject Premises 3"). Subject Premises 3 is a red brick and brown stucco commercial building with numerous individual units. More specifically, unit A-1 is a beige door with large bold black lettering to the right of the door that read "A-1" with a black mailbox affixed to the right of the door.

 



## ATTACHMENT B-3

### Items to be Seized

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1)(C) (possession with intent to distribute and distribution of controlled substances) and 843(b) (use of a telephone in furtherance of a drug trafficking offense), and involve WILSON GUZMAN, JR. ("GUZMAN"), including:

a. Controlled substances, including marijuana, oxycodone, Adderall, fentanyl, methamphetamine, and mushrooms;

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol mannite, vitamin B-12, and inositol;

c. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e. Items of personal property that pertain to the identity of the person(s) within the premises and occupancy, control, or ownership of the premises,

including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

f.  Documents indicating interstate travel, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel and car rental statements, correspondence with travel agencies and other travel-related businesses, airline, rental car, and hotel receipts, frequent flyer or user cards and statements, telephone bills, photographs/video tapes, and other papers relating to domestic and international travel, including computerized records;

g.  Cellular/digital wireless telephones and "smart" cellular telephones owned, possessed, or used by GUZMAN and capable of running the Telegram application;

h.  Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.  Firearms and ammunition;

j.  Records of banking, financial, and investment accounts for GUZMAN, including statements, checks, check stubs or registers, deposit slips and deposit items, withdrawal slips, cancelled checks, cashier's checks, money

orders, wire transfer documents, loan records, mortgage records, financial statements, credit card statements, safe deposit box rental and payment documents, and safe deposit box keys;

k.  Any and all business records, including general ledgers and subsidiary ledgers, cash receipts journals, cash disbursement journals, petty cash journals, appointment books, calendars, passbooks, invoices, written estimates, receipts, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, point-of-sale (POS) system hardware and records, computerized bookkeeping software and files;

l.  Any and all copies of and/or original federal and state income tax, payroll tax, sales tax, and informational returns, including amended federal and state income tax, payroll tax, and sales tax returns, as well as any and all records used in, or resulting from, the preparation and filing of federal and state income tax, payroll tax, and sales tax returns, consisting of but not limited to work-papers, notes, papers, memoranda and correspondence;

m. Credit card records, including application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and methods (cash or check) of repayment, checks used to make repayments (front and back);

n.  Records of purchases of bank checks, cashier, teller, travelers check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders;

o.  Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through a bank, savings bond transactions and investment accounts. Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions; and

p.  Records and tangible items related to the source, collection, use and/or secretion of assets or cash, including cash and United States Currency in excess of $2,000.

## ATTACHMENT A-4

### Property to be Searched

The property to be searched is a red 2021 Chevrolet Trailblazer bearing Connecticut License Plate Number AR65710 and VIN 3GNKBKRS2MS5862 ("Subject Vehicle").





**ATTACHMENT B-4**

**Items to be Seized**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1)(C) (possession with intent to distribute and distribution of controlled substances) and 843(b) (use of a telephone in furtherance of a drug trafficking offense), and involve WILSON GUZMAN, JR. ("GUZMAN"), including:

a. Controlled substances, including marijuana, oxycodone, Adderall, fentanyl, methamphetamine, and mushrooms;

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, and diluents such as mannitol mannite, vitamin B-12, and inositol;

c. Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, including computerized records of same;

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances or the laundering of the proceeds thereof, including computerized records of same;

e. Items of personal property that pertain to the identity of the person(s) within the Subject Vehicle and occupancy, control, or ownership of the

Subject Vehicle, including but not limited to cancelled mail, deeds, leases, rental agreements, photographs, video tapes, personal telephone books, diaries, utility and telephone bills, bank statements, identification documents, and keys;

f.  Documents indicating interstate travel, to include airline tickets, notes and travel itineraries, airline schedules, bills, charge card receipts, hotel, motel and car rental statements, correspondence with travel agencies and other travel-related businesses, airline, rental car, and hotel receipts, frequent flyer or user cards and statements, telephone bills, photographs/video tapes, and other papers relating to domestic and international travel, including computerized records;

g.  Cellular/digital wireless telephones and "smart" cellular telephones owned, possessed, or used by GUZMAN and capable of running the Telegram application;

h.  Safes, lock boxes and other containers in which any of the above items may be contained or concealed, as well as keys therefor and records pertaining thereto, together with the contents thereof, including any of the above items contained therein;

i.  Firearms and ammunition;

j.  Records of banking, financial, and investment accounts for GUZMAN, including statements, checks, check stubs or registers, deposit slips and deposit items, withdrawal slips, cancelled checks, cashier's checks, money

orders, wire transfer documents, loan records, mortgage records, financial statements, credit card statements, safe deposit box rental and payment documents, and safe deposit box keys;

k.  Any and all business records, including general ledgers and subsidiary ledgers, cash receipts journals, cash disbursement journals, petty cash journals, appointment books, calendars, passbooks, invoices, written estimates, receipts, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, point-of-sale (POS) system hardware and records, computerized bookkeeping software and files;

l.  Any and all copies of and/or original federal and state income tax, payroll tax, sales tax, and informational returns, including amended federal and state income tax, payroll tax, and sales tax returns, as well as any and all records used in, or resulting from, the preparation and filing of federal and state income tax, payroll tax, and sales tax returns, consisting of but not limited to work-papers, notes, papers, memoranda and correspondence;

m. Credit card records, including application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and methods (cash or check) of repayment, checks used to make repayments (front and back);

n.  Records of purchases of bank checks, cashier, teller, travelers check records, or money order records including the check register, file copies of the checks or money orders, records revealing the date and source of payment for said checks or money orders;

o.  Records of certified checks, wire transfers, or collections, letters of credit, bonds and securities purchased through a bank, savings bond transactions and investment accounts. Such records that disclose the date and amount of the transaction, method (cash or check) and source of payment, instruments and statements of transactions; and

p.  Records and tangible items related to the source, collection, use and/or secretion of assets or cash, including cash and United States Currency in excess of $2,000.